UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| _____ ) | |
| CATO INSTITUTE ) | |
| 1000 Massachusetts Avenue, NW ) | |
| Washington, DC  20001 ) | |
|  ) | |
|  ) | |
| *Plaintiff*, ) | |
|  ) | |
| v.  ) | Civil Case No. _____ |
|  ) | |
|  ) | |
|  ) | |
| UNITED STATES SECURITIES AND ) | |
| EXCHANGE COMMISSION, ) | |
| 100 F Street, NE ) | |
| Washington, DC  20549; ) | |
|  ) | |
| JAY CLAYTON, in his official capacity ) | |
| as Chairman of the U.S. Securities and ) | |
| Exchange Commission, ) | |
| 100 F Street, NE ) | |
| Washington, DC  20549; ) | |
|  ) | |
| BRENT J. FIELDS, in his official capacity ) | |
| As Secretary of the U.S. Securities ) | |
| and Exchange Commission, ) | |
| 100 F Street, NE ) | |
| Washington, DC  20549 ) | |
|  ) | |
| *Defendants*. ) | |
| _____) | |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

**INTRODUCTION**

1.      This civil-rights lawsuit challenges an unconstitutional federal policy of

conditioning civil settlements on a lifetime gag order that prohibits settling defendants from *ever*

denying "any allegation in [the government's] complaint." In effect, the government uses its extraordinary leverage in civil litigation to extract from settling defendants a promise to never tell their side of the story, no matter how outrageous the government's conduct may have been and no matter how strong the public's interest may be in knowing how the government conducts itself in high-stakes civil litigation.

2.      The Cato Institute is a nonprofit think tank and publisher that wants to—but legally cannot—publish a book recounting perceived overreach on the part of the Securities and Exchange Commission ("SEC"). Cato cannot publish the proposed book because the SEC previously coerced the book's author (as a condition of settling the enforcement action that prompted the book in the first place) into a broad and sweeping gag order that effectively prohibits him from criticizing any aspect of the SEC's enforcement actions against him. In fact, the SEC has demanded such an overbroad gag order in every (or nearly every) similar civil or administrative settlement it has entered into over the course of the past forty years, routinely conditioning settlement on a defendant's waiver of his First Amendment rights. This civil-rights lawsuit seeks to end the federal government's decades-long use of gag orders in violation of the First Amendment to the United States Constitution and to vindicate the Cato Institute's basic First Amendment right to publish a book critical of official government conduct.

3.      Specifically, the Cato Institute is currently unable to exercise its contractual right to publish the above-mentioned book because the book's author is bound by a gag-order agreement he was required to enter into as a condition of settling an SEC enforcement action. The Cato Institute believes the SEC gag-order agreement is unenforceable under the First Amendment and brings this action seeking a declaration to that effect in order to clarify its own rights and responsibilities as a publisher.

## JURISDICTION AND VENUE

4.      Plaintiff brings this civil-rights lawsuit pursuant to the First Amendment of the United States Constitution and the Declaratory Judgment Act, 28 U.S.C. § 2201.

5.      This Court has jurisdiction pursuant to 13 U.S.C. §§ 1331 and 1346.

6.      Venue lies in this Court pursuant to 28 U.S.C. § 1391(b).

## PARTIES

7.      Plaintiff the Cato Institute is a nonprofit corporation organized under the laws of the State of Kansas with its primary place of business in the District of Columbia. Cato is a think tank dedicated to the principles of individual liberty, limited government, free markets, and peace. Cato advances its mission by (among other things) publishing books on topics of scholarly and public-policy interest. It currently has a contract to publish a book critical of the SEC, but it is unable to exercise its contractual right to publish that book because the book's author is a party to a broad agreement (the "gag order") that prohibits him from disputing the truth of any allegations the SEC made against him in a now-closed civil-enforcement action.

8.      Defendant SEC is an independent federal government agency. It is a party to the gag-order agreement that currently prevents the Cato Institute from exercising its contractual right to publish a book critical of the agency, and it has entered into thousands of similar gag-order agreements nationwide. The SEC's headquarters is located in the District of Columbia.

9.      Defendant Jay Clayton is named in his official capacity as the Chairman of the SEC. As Chairman of the SEC, Defendant Clayton is the agency's chief executive and is responsible for the executive and administrative functions of the SEC. 15 U.S.C. § 78d.

10.      Defendant Brent Fields is named in his official capacity as the Secretary of the SEC and Director of the SEC Office of the Secretary. Among Defendant Fields' duties as

Director of the SEC Office of the Secretary are issuing orders pursuant to SEC-approved

settlements and maintaining and certifying SEC records for administrative and judicial

proceedings. 17 C.F.R. § 200.30-7.

## FACTUAL ALLEGATIONS

### *The SEC's Gag Regulation*

11.     In 1972, the SEC promulgated 17 C.F.R. § 202.5(e); 37 Fed. Reg. 25,224 (Nov.

28, 1972) (the "Gag Regulation").

12.     The Gag Regulation has not been altered or amended since it was promulgated in

1972.

13.     The Gag Regulation provides:

The Commission has adopted the policy that in any civil lawsuit brought by it or
in any administrative proceeding of an accusatory nature pending before it, it is
important to avoid creating, or permitting to be created, an impression that a
decree is being entered or a sanction imposed, when the conduct alleged did not,
in fact, occur. Accordingly, it hereby announces its policy not to permit a
defendant or respondent to consent to a judgment or order that imposes a sanction
while denying the allegations in the complaint or order for proceedings. In this
regard, the Commission believes that a refusal to admit the allegations is
equivalent to a denial, unless the defendant or respondent states that he neither
admits nor denies the allegations.

17 C.F.R. § 202.5(e).

14.     Upon information and belief, the SEC interprets (and has consistently

interpreted) this regulation as requiring it to demand, as a condition of settling any civil

or administrative action, that all settling defendants promise *never* to publicly contest *any*

of the allegations the SEC has made against them.

15.     The Gag Regulation's stated purpose is to "avoid creating, or permitting to be

created, an impression that a decree is being entered or a sanction imposed, when the conduct

alleged did not, in fact, occur." 17 C.F.R. § 202.5(e).

16.     The Gag Regulation has no other purpose beyond its stated purpose.

17.     In other words, the sole purpose of the Gag Regulation is to affect public perception of the SEC and the SEC's enforcement activities.

18.     The Gag Regulation accomplishes its purpose by restricting constitutionally protected speech—specifically, speech critical of the SEC itself.

19.     In accord with its interpretation of 17 C.F.R. § 202.5(e), the SEC routinely prohibits parties that enter into consent agreements with the SEC from ever publicly asserting that any of the SEC's allegations are untrue or otherwise lack a factual basis—even after the case has been settled and the underlying lawsuit or administrative proceeding dismissed.

20.     Upon information and belief, any party that settles with the SEC in a civil proceeding must "agree[] not to take any action or to make or cause to be made any public statement denying, directly or indirectly, any allegation in the complaint or creating the impression that the complaint is without factual basis."

21.     Upon information and belief, any party that settles with the SEC in an administrative proceeding must "agree[] not to take any action or to make or cause to be made any public statement denying, directly or indirectly, any allegation in the complaint or creating the impression that the complaint is without factual basis."

22.     Upon information and belief, in accord with 17 C.F.R. § 202.5(e), the SEC demands blanket, perpetual gag orders of this sort in every case it settles without making any individualized determinations about the need for such an order or the appropriate scope of such an order in a given case.

23.     The SEC settles almost all of the civil actions it initiates.

24.     For example, "[s]ince 2002, the SEC's settlement rate has remained constant at about ninety-eight percent." Priyah Kaul, *Admit or Deny: A Call for Reform of the SEC's 'Neither-Admit-Nor-Deny' Policy*, 48 U. Mich. J. L. Refor 535, 536 (2015).

25.     Upon information and belief, the SEC can (and sometimes does) enter into settlement agreements in which a defendant admits to specific conduct while neither admitting nor denying the remainder of the SEC's allegations.

26.     Upon information and belief, the SEC can (and sometimes does) enter into settlement agreements in which a defendant admits to no specific conduct and neither admits nor denies any of the SEC's allegations.

27.     Whether or not an SEC settlement agreement includes admissions that specific allegations are true, the SEC's interpretation of the Gag Regulation, as reflected and embodied in civil settlements like the one at issue in this case, does not permit the SEC to settle a civil or administrative enforcement action unless a defendant agrees never to publicly dispute *any* of the SEC's allegations.

28.     Upon information and belief, the SEC actually enforces the gag orders it obtains under its interpretation of the Gag Regulation, including (but not limited to) by demanding that former defendants issue retractions when they make statements that the SEC deems violate their obligation to never dispute the truth of any of the SEC's allegations.

### The Cato Institute and the Banned Book

29.     In 2018, Clark Neily, a licensed attorney, experienced constitutional litigator, and currently the Vice President for Criminal Justice at the Cato Institute, privately received a copy of a manuscript written by an author who claimed he had been the victim of prosecutorial overreach at the hands of officials at the SEC ("the SEC manuscript"). The author contacted

Neily seeking assistance in assessing the validity of the gag order contained in the author's SEC

settlement and the prospects for challenging that provision or otherwise obtaining relief from the

speech-limiting requirements of that provision in order to allow the SEC manuscript to be made

public.

30.    The SEC manuscript describes a long and expensive battle at the end of which the

author (who was accused of substantial wrongdoing by the SEC in both legal documents and

press statements) ultimately admitted to engaging in certain limited conduct in order to avoid

crippling litigation expenses.

31.    In addition to providing the author with his legal opinions, Neily developed the

opinion that publishing the SEC manuscript would advance important public-policy goals of the

Cato Institute. In Neily's view, the SEC manuscript was persuasive and illustrated many issues—

including prosecutorial discretion, routine over-charging, and the danger of coercive settlements

or plea bargains—that had been at the heart of Neily's public advocacy at the Cato Institute.

Neily had spoken and written extensively about these topics in his role at Cato, and he believed

that publishing the SEC manuscript would be a substantial addition to the public debate on these

issues of public importance.

32.    In 2018, the Cato Institute entered into a contract with the author to publish the

SEC manuscript as a book.

33.    The Cato Institute has taken substantial steps toward publishing the SEC

manuscript, including an initial thorough edit of the text.

34.    But the Cato Institute cannot exercise its contractual right to publish the book

because the manuscript's author ultimately settled his enforcement action and so is bound by one

of the gag orders required by the Gag Regulation. Despite the fact that the author actually

admitted to only limited unlawful conduct in his settlement agreement, the agreement forbids

him from publicly challenging the accuracy of *any* of the SEC's allegations. Writing the SEC

manuscript and privately conveying it to Neily were *private* statements of dissent, but allowing

the Cato Institute to actually publish the SEC manuscript would be a *public* statement of dissent

and so would be barred by the gag order.

35.    Specifically, the gag order at issue states (in relevant part):

> Defendant understands and agrees to comply with the
> Commission's policy "not to permit a defendant or respondent to
> consent to a judgment or order that imposes a sanction while
> denying the allegation in the complaint or order for proceedings."
> 17 C.F.R. § 202.5. In compliance with this policy, Defendant
> agrees not to take any action or to make or cause to be made any
> public statement denying, directly or indirectly, any allegation in
> the complaint or creating the impression that the complaint is
> without factual basis. Defendant may testify truthfully about any
> matter under oath in connection with a legal or administrative
> proceeding, whether or not under subpoena . . . . If Defendant
> breaches this agreement, the Commission may petition the Court to
> vacate the Final Judgment and restore this action to its active
> docket. Nothing in this paragraph affects Defendant's: (i)
> testimonial obligations, or (ii) right to take legal or factual
> positions in litigation or other legal proceedings in which the
> [SEC] is not a party including, but not limited to, legal proceedings
> arising out of the matters filed in the bankruptcy court.

36.    In the SEC manuscript, the author asserts that the SEC's allegations against him

were unfounded and unfair. Nothing in his settlement agreement required him to admit the truth

of the SEC's allegations (except for those explicitly admitted), but he is nonetheless barred from

publicly asserting his honest assessment of them.

37.    As a direct result of this gag order, Cato cannot exercise what would otherwise be

its contractual right to publish and promote the SEC manuscript.

38.    But for the gag order, Cato would immediately complete its editorial process and

publish the SEC manuscript.

39.     The Cato Institute's publication agreement for the SEC manuscript also authorizes Cato to undertake promotional activities relating to the book. But for the gag order, Cato would also engage in other related public speech—including, but not limited to, writing about the book in newspapers and on the internet as well as sponsoring promotional events (which would include appearances by the book's author and potentially other individuals who are subject to similar gag orders).

### The SEC's Enforcement of the Gag Regulation
### Creates a Content-Based Restriction on Speech

40.     Content-based regulations of speech are presumptively invalid.

41.     Content-based regulations of speech are unconstitutional unless they are narrowly tailored to serve a compelling government interest.

42.     The SEC's use of gag provisions prohibits individuals who have settled civil or administrative actions with the SEC from publicly questioning the truth of allegations made by the SEC.

43.     The SEC's use of gag provisions in consent agreements results in a content-based restriction on speech.

44.     The SEC's use of the gag provision in the above-referenced consent agreement is a content-based restriction on speech.

45.     The unconstitutional-conditions doctrine prohibits government from conditioning receipt of a benefit on the waiver of a constitutionally guaranteed right.

46.     Even when the government is under no obligation to offer a benefit, once it voluntarily chooses to do so, it cannot condition the receipt of the benefit on the waiver of a constitutionally guaranteed right.

47.     Upon information and belief, the SEC can present no evidence that requiring defendants to refrain from publicly denying the truth of allegations in perpetuity (particularly allegations that have been neither proven nor admitted by the defendant) is necessary to achieve any compelling government end.

48.     The government may not impose a content-based restriction on speech through direct legislation.

49.     The SEC could not impose a content-based restriction on speech through legislative action.

50.     The SEC may not impose content-based restrictions on speech as a condition of the settlement of a civil or administrative proceeding.

51.     The government may not enforce a content-based restriction on speech.

52.     Because the above-referenced gag order is a content-based restriction on speech, that portion of the agreement is unenforceable as a matter of law.

### *The SEC's Settlement Tactics Have Faced Scrutiny*

53.     Given that the SEC takes very few civil actions to trial, the SEC knows when it initiates a civil action that it is unlikely it will ever have to prove the truth of its allegations to the satisfaction of a neutral adjudicator.

54.     Upon information and belief, the SEC uses various techniques, including freezing defendants' financial accounts so they are unable to pay for legal counsel, to coerce individuals into settling civil proceedings.

55.     At least one federal district court has strongly criticized the SEC's use of gag provisions as a condition to settlement. *See SEC v. Vitesse Semiconductor Corp.*, 771 F. Supp. 2d 304, 309 (S.D.N.Y. 2011) ("Only one thing is left certain: the public will never know whether

the SEC's charges are true, at least not in a way that they can take as established by these proceedings. * * * This might be defensible if all that were involved was a private dispute between private parties. But here an agency of the United States is saying, in effect, 'Although we claim that these defendants have done terrible things, they refuse to admit it and we do not propose to prove it, but will simply resort to gagging their right to deny it.'").

56.     These serious criticisms illustrate that the SEC's enforcement and settlement practices are an issue of great public concern. The gag orders required by the Gag Regulation, therefore, suppress speech that is at the very center of an ongoing public debate.

**INJURY TO PLAINTIFF**

57.     In the absence of an order from this Court declaring the above-referenced gag order unenforceable as a matter of law, the Cato Institute will be unable to exercise its contractual rights to publish a book that it deems important to its mission and to the public's understanding of the SEC's enforcement policies.

58.     In the absence of an order from this Court declaring unconstitutional the SEC's overall policy of demanding broad gag orders as a condition of all civil or administrative settlements, the Cato Institute will be unable to present panel discussions or other forms of public dialogue featuring individuals who have been subject to SEC enforcement actions. The Cato Institute routinely sponsors panel discussions—including panel discussions on coercive settlements in the law-enforcement context—and but for the SEC's enforcement of the Gag Regulation, it would be able to sponsor events featuring alleged victims of the SEC's overreach.

## CONSTITUTIONAL VIOLATION

### <u>Count I</u>
### (First Amendment to the U.S. Constitution)

59.     All preceding allegations are incorporated here as if set forth in full.

60.     The First Amendment protects the right to speak freely.

61.     The First Amendment protects the right to receive information.

62.     The First Amendment protects freedom of the press.

63.     The SEC's policy and practice of demanding gag orders in all settlements, as required by its interpretation of 17 C.F.R. § 202.5(e), violates the guarantees of the First Amendment.

64.     Any enforcement of the gag order quoted in paragraph 35 would violate the guarantees of the First Amendment.

65.     The SEC's routine use of gag orders in settlements results in content-based restrictions on the right to speak freely.

66.     The specific gag order quoted in paragraph 35 is a content-based restriction on the right to speak freely.

67.     The SEC's routine use of gag orders in settlements results in content-based restrictions on the right to receive information.

68.     The specific gag order quoted in paragraph 35 is a content-based restriction on the right to receive information.

69.     The SEC's use of gag provisions results in content-based restrictions on the freedom of the press.

70.     The specific gag order quoted in paragraph 35 is a content-based restriction on the freedom of the press.

71.     The government has no legitimate interest in silencing individuals accused of wrongdoing by the SEC in perpetuity.

72.     The SEC has no legitimate interest in protecting its reputation at the expense of protected First Amendment rights.

73.     No governmental interest could justify the SEC's use of perpetual gag orders in all settlements.

74.     The SEC's use of perpetual gag orders is not narrowly tailored to serve any government interest.

75.     The SEC's interpretation and enforcement of the Gag Regulation and imposition of perpetual gag orders in consent agreements is overbroad.

76.     Upon information and belief, Defendants possess no evidence that the perpetual gag-order provision quoted in paragraph 35 is necessary to achieve any government interest.

77.     Upon information and belief, Defendants possess no evidence that their interpretation and enforcement of the Gag Regulation is necessary to achieve any government interest.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request relief as follows:

A.     A declaratory judgment that the Gag Regulation, 17 C.F.R. § 202.5(e), as interpreted and enforced by the SEC, is unconstitutional under the First Amendment to the United States Constitution;

B.     A permanent injunction against enforcement of the Gag Regulation;

C.      A declaratory judgment that the gag-order provision quoted in paragraph 35 and

contained in the settlement agreement entered into by the author of the SEC manuscript is

unenforceable as a matter of law;

D.      A declaratory judgment that all past gag provisions in consent decrees entered in

civil or administrative settlements with the SEC are unenforceable;

E.      A permanent injunction prohibiting the SEC from continuing its practice of non-

discretionary use of gag provisions in civil and administrative settlements;

F.      All further legal and equitable relief as the Court may deem just and proper.

RESPECTFULLY SUBMITTED this 9th day of January 2019.

/s/ Paul M. Sherman
Paul M. Sherman (DC Bar No. 978663)
Robert J. McNamara (VA Bar No. 73208)†
INSTITUTE FOR JUSTICE
901 N. Glebe Road, Suite 900
Arlington, Virginia 22203
Telephone:  (703) 682-9320
Facsimile:  (703) 682-9321
Email:  psherman@ij.org

Jaimie N. Cavanaugh (MN Bar No. 399960)*
INSTITUTE FOR JUSTICE
520 Nicollet Mall, Suite 550
Minneapolis, Minnesota 55402
Telephone:  (612) 435-3451
Facsimile:  (612) 435-5875
Email:  jcavanaugh@ij.org

*Attorneys for Plaintiffs*

†application for admission to the bar of this Court
pending

*application for admission *pro hac vice* filed
concurrently with this document