**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| _____ ) | |
| CATO INSTITUTE ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 19-0047 (ABJ) |
| ) | |
| UNITED STATES ) | |
| SECURITIES AND ) | |
| EXCHANGE COMMISSION, *et al.*, ) | |
| ) | |
| Defendants. ) | |
| _____) | |

## **MEMORANDUM OPINION**

Plaintiff Cato Institute ("Cato" or "plaintiff") has brought this action against the United States Securities and Exchange Commission ("SEC"); Jay Clayton, in his official capacity as Chairman of the SEC; and Vanessa A. Countryman, in her official capacity as Secretary of the SEC. Plaintiff seeks to challenge the SEC's policy of including "no-deny" provisions in its consent judgments in civil or administrative proceedings. Am. Compl. [Dkt. # 11]. These provisions preclude a settling party from publicly denying the allegations in a complaint resolved by consent. *Id*. ¶ 1. Plaintiff claims that the agency's policy of silencing the subjects of its investigations violates the First Amendment of the Constitution. *Id.* ¶ 73. But the Cato Institute was not the subject of any investigation, and it is not party to any consent judgment; it brings this action alleging that its ability to publish and promote the parties' stories has been compromised.

Defendants moved to dismiss the complaint on the grounds that plaintiff lacks standing to bring the case and that it has failed to state a claim upon which relief can be granted. Defs.' Mot. to Dismiss Pl.'s Am. Compl. [Dkt. # 12] ("Defs.' Mot."). Because the Court finds that plaintiff

lacks standing to challenge the SEC's "no-deny" policy, the Court will grant defendants' motion to dismiss for lack of subject matter jurisdiction. Because the Court has no power to hear the case, this opinion does not address the merits of the dispute, and it should not be read to express any view about the wisdom of the policy.

## BACKGROUND

In 1972, the SEC promulgated a regulation adopting a formal policy that it would not "permit a defendant or respondent to consent to a judgment or order that imposes a sanction while denying the allegations in the complaint or order for proceedings." 17 C.F.R. § 202.5(e) (1972). The agency explained that "in any civil lawsuit brought by [the SEC] or in any administrative proceeding of an accusatory nature pending before it, it is important to avoid creating, or permitting to be created, an impression that a decree is being entered or a sanction imposed, when the conducted alleged did not, in fact, occur." *Id.*

Plaintiff alleges that the SEC has carried out this policy by requiring that an express "no-deny" provision be included in the consent judgment as a condition of settling any civil or administrative action brought by the agency. Am. Compl. ¶ 16. The provision prohibits settling defendants from "publicly asserting that any of the SEC's allegations are untrue or otherwise lack a factual basis." *Id.* ¶ 21. And, according to the complaint, since 2002, the SEC has had a steady settlement rate of approximately ninety-eight percent. *Id.* ¶ 26, citing Priyah Kaul, *Admit or Deny: A Call for Reform of the SEC's 'Neither-Admit-Nor-Deny' Policy*, 48 U. MICH. J. L. REFOR. 535, 536 (2015).

The events that form the basis of plaintiff's suit began in 2018, when Cato's Vice President for Criminal Justice, Clark Neily, "privately received a copy of a manuscript written by an author who claimed he had been the victim of prosecutorial overreach at the hands of officials at the SEC." Am. Compl. ¶ 31. The amended complaint states that the manuscript "describes a long and

expensive battle at the end of which the author . . . ultimately [settled and] admitted to engaging

in certain limited conduct in order to avoid crippling litigation expenses." *Id.* ¶ 32.

> The "no-deny" provision contained in the author's settlement agreement provides:

>> Defendant understands and agrees to comply with the Commission's policy "not to permit a defendant or respondent to consent to a judgment or order that imposes a sanction while denying the allegation in the complaint or order for proceedings." 17 C.F.R. § 202.5. In compliance with this policy, Defendant agrees not to take any action or to make or cause to be made any public statement denying, directly or indirectly, any allegation in the complaint or creating the impression that the complaint is without factual basis. Defendant may testify truthfully about any matter under oath in connection with a legal or administrative proceeding, whether or not under subpoena . . . . If Defendant breaches this agreement, the Commission may petition the Court to vacate the Final Judgment and restore this action to its active docket.[1]

*Id.* ¶ 37.   The author asked Neily to assess the validity of the policy and the prospects for

challenging or being relieved from the no-deny provision, so that he could publish his manuscript.

*Id.* ¶ 31.   In Neily's view, publishing the author's manuscript would "advance important public-

policy goals of the Cato Institute"; the document addresses issues that have already been the

subject of the organization's work, including "prosecutorial discretion, routine over-charging, and

the danger of coercive settlements or plea bargains." *Id.* ¶ 33.   In 2018, Cato entered into a contract

with the author to publish his manuscript.[2] *Id.* ¶ 34.

Plaintiff alleges that it has taken substantial steps towards publication, but that it "cannot"

complete the process because the author is bound by the "no-deny" provision contained in his

---

1       The provision goes on:  "[n]othing in this paragraph affects Defendant's: (i) testimonial obligations, or (ii) right to take legal or factual positions in litigation or other legal proceedings in which the [SEC] is not a party including, but not limited to, legal proceedings arising out of the matters filed in the bankruptcy court."  Am. Compl. ¶ 37.

2       The complaint does not allege that the author or the contract placed any restrictions on the Cato Institute's right to publish the manuscript.

settlement agreement.  Am. Compl. ¶¶ 35–36.  Plaintiff claims it "cannot exercise what would

otherwise be its contractual right to publish and promote the SEC manuscript"; "[b]ut for the gag

order," it "would immediately complete its editorial process and publish the SEC manuscript."

*Id.* ¶¶ 39–40.  Plaintiff says it would also "undertake promotional activities relating to the

book . . . [such as] writing about the book in newspapers and on the internet as well as sponsoring

promotional events."  *Id.* ¶ 41.  According to the complaint, the publication of the author's

manuscript and the public promotion of the book would be a violation of the author's settlement

agreement with the SEC.[3]  *Id.*

Plaintiff also alleges that there are other individuals who signed "no-deny" provisions as a

condition of settling enforcement actions who are willing to speak out against the SEC's policy.

Am. Compl. ¶ 42.  They contacted Cato and Vice President Neily in the wake of this lawsuit and

voiced an interest in publicly contesting the SEC's allegations in their cases.  *Id.*  Plaintiff alleges:

> But for the gag orders in place, these individuals would also be willing to
> permit the Cato Institute to publicly tell their stories or portions of their
> stories, including by repeating relevant details or quotations in essays, op-
> eds, or blog posts.  Because and only because of the gag orders, the Cato
> Institute is unable to publish essays, op-eds, or blog posts containing any of
> these details or quotations.

*Id.* ¶ 44.  Plaintiff also alleges that it "has begun to plan a panel discussion," since the "direct

testimony of the individuals . . . would be the most effective way to advance their public

argument."  *Id.* ¶ 45.  According to plaintiff, "[b]ut for the existence of the gag orders, Cato would

be able to very quickly complete its plans and hold this public discussion . . . [and] host additional

events . . . ."  *Id.* ¶¶ 46–47.  Plaintiff concludes in Count I that the policy and practice of demanding

3       Again, the amended complaint does not allege that either the author or the SEC has asked
Cato to desist from such activities.

no-deny provisions violates the First Amendment, and that their use and enforcement impose content-based restrictions on the right to speak freely. *Id.* ¶¶ 73–75.

Plaintiff initiated this action on January 9, 2019 and filed an amended complaint on March 1, 2019. Compl. [Dkt. # 1]; Am. Compl. It contends that the SEC's policy of including "no-deny" provisions in its consent judgments is a content-based regulation of speech that violates the First Amendment. *See* Am. Compl. ¶¶ 49–61. Plaintiff seeks: (1) a declaratory judgment that the SEC's "no-deny" policy is unconstitutional and unenforceable under the First Amendment; and (2) a permanent injunction barring the enforcement of preexisting "no-deny" provisions and prohibiting the implementation of the policy in the future. *Id.* at 16.

On May 10, 2019, defendants moved to dismiss the amended complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). Defs.' Mot. at 1. Plaintiff opposed the motion on May 24, 2019, Pl.'s Opp. to Defs.' Mot. [Dkt. # 13] ("Pl.'s Opp."), and defendants filed a reply on June 7, 2019. Reply Mem. in Supp. of Defs.' Mot. [Dkt. # 15] ("Defs.' Reply"). Plaintiff also submitted a Notice of Supplemental Authority on July 12, 2019, *see* [Dkt. # 16-1] ("Pl.'s Notice"), to which defendants responded to on July 17, 2019. Defs.' Response to Pl.'s Notice [Dkt. # 17].

## STANDARD OF REVIEW

In evaluating a motion to dismiss, the Court must "treat the complaint's factual allegations as true and must grant plaintiff 'the benefit of all inferences that can be derived from the facts alleged.'" *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000) (internal citation omitted), quoting *Schuler v. United States*, 617 F.2d 605, 608 (D.C. Cir. 1979); *see also Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011), quoting *Thomas v. Principi*, 394 F.3d 970, 972 (D.C. Cir. 2005). Nevertheless, the Court need not accept inferences drawn by the plaintiff if those inferences are unsupported by facts alleged in the complaint, nor must the

Court accept plaintiff's legal conclusions.  *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002).

Under Rule 12(b)(1), the plaintiff bears the burden of establishing jurisdiction by a preponderance of the evidence.  *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992); *Shekoyan v. Sibley Int'l Corp.*, 217 F. Supp. 2d 59, 63 (D.D.C. 2002).  Federal courts are courts of limited jurisdiction and the law presumes that "a cause lies outside this limited jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994); *see also Gen. Motors Corp. v. EPA*, 363 F.3d 442, 448 (D.C. Cir. 2004) ("As a court of limited jurisdiction, we begin, and end, with an examination of our jurisdiction.").  "[B]ecause subject-matter jurisdiction is 'an Art[icle] III as well as a statutory requirement . . . no action of the parties can confer subject-matter jurisdiction upon a federal court.'"  *Akinseye v. District of Columbia*, 339 F.3d 970, 971 (D.C. Cir. 2003), quoting *Ins. Corp. of Ir., Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982).

When considering a motion to dismiss for lack of jurisdiction, unlike when deciding a motion to dismiss under Rule 12(b)(6), the court "is not limited to the allegations of the complaint." *Hohri v. United States*, 782 F.2d 227, 241 (D.C. Cir. 1986), *vacated on other grounds*, 482 U.S. 64 (1987).  Rather, "a court may consider such materials outside the pleadings as it deems appropriate to resolve the question [of] whether it has jurisdiction to hear the case."  *Scolaro v. D.C. Bd. of Elections & Ethics*, 104 F. Supp. 2d 18, 22 (D.D.C. 2000), citing *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992); *see also Jerome Stevens Pharms., Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005).

## ANALYSIS

This case begins and ends with the Cato Institute's constitutional standing to challenge a policy the SEC follows when it settles enforcement actions against others.  Notably, Count I never

states *whose* First Amendment rights are being violated, and that is the problem at the heart of the case.

"To state a case or controversy under Article III, a plaintiff must establish standing." *Ariz. Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125, 133 (2011); *accord Lujan*, 504 U.S. at 560 ("standing is an essential and unchanging part of the case-or-controversy requirement of Article III"). Standing is a necessary predicate to any exercise of federal jurisdiction; if it is lacking, the dispute is not a proper case or controversy under Article III, and federal courts have no subject matter jurisdiction to decide the case. *Dominguez v. Ual Corp.*, 666 F.3d 1359, 1361 (D.C. Cir. 2012).

To establish constitutional standing, plaintiff must demonstrate: (1) that it has suffered a concrete, particularized, and actual or imminent "injury-in-fact"; (2) that the injury is "fairly traceable" to the challenged action of the defendant; and (3) that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan*, 504 U.S. at 560–61, quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41 (1976) (internal quotation marks omitted); *see also Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 180–81 (2000). "The party invoking federal jurisdiction bears the burden of establishing" standing, *Lujan*, 504 U.S. at 561, although "[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice." *Id.* (internal citations omitted).

The Court finds that plaintiff has not alleged sufficient facts to satisfy the first element. To allege an injury-in-fact, a plaintiff must allege that it has suffered "an invasion of a legally protected interest that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Id.* at 560–61 (internal citations omitted), quoting *Allen v. Wright*, 468 U.S. 737, 756 (1984). To be "concrete," the injury "must actually exist," meaning that it is real, and not

abstract, although concreteness is "not . . . necessarily synonymous with 'tangible.'" *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548–49 (2016); *Warth v. Seldin,* 422 U.S. 490, 501 (1975) (the injury must be "distinct and palpable"). And to be "particularized," the injury must affect a plaintiff "in a personal and individual way." *Spokeo*, 136 S.Ct. at 1548, quoting *Lujan*, 504 U.S. at 560 n.1. "[A] plaintiff raising only a generally available grievance about government – claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large – does not state an Article III case or controversy." *Lujan*, 504 U.S. at 573.

Plaintiff contends that it has been injured as both a would-be listener and a would-be speaker. Pl.'s Opp. at 2. Its opposition to the motion to dismiss explains that the complaint alleges that SEC's enforcement of its orders "is chilling the speech of individuals who would . . . otherwise be speaking today," *id.*, and that the orders and the individuals' fear of their enforcement "stand in the way of Cato's activities." *Id.* at 3. Plaintiff posits that this adds up to an allegation that its own expression is being chilled. *Id*. at 4. The amended complaint asserts that "in the absence of an order . . . declaring the . . . gag order unenforceable," Cato will be "unable" to (1) exercise its contractual rights to publish the author's book; (2) finalize plans for hosting a panel discussion featuring alleged victims of the SEC's overreach; and (3) publish articles, blog posts, and other commentaries on the SEC's prosecutorial tactics. *See* Am. Compl. ¶¶ 66–68.

Cato's attempt to premise a constitutional violation that it has standing to vindicate on a chilling effect theory fails in the absence of an allegation that it has suffered, or it is facing the threat of, actual concrete harm. "[A]t an irreducible minimum, Art. III requires the party who invokes the court's authority to 'show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant.'" *Valley Forge Christian Coll.*

*v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 472 (1982), quoting *Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 99 (1979). In *Laird v. Tatum,* 408 U.S. 1, 13–14 (1972), the Supreme Court held that "allegations of a subjective 'chill are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm." And the D.C. Circuit has reiterated that the sort of "chilling effect" alleged here is foreclosed as a basis for standing by the *Laird* decision. *United Presbyterian Church in the U.S.A. v. Reagan*, 738 F.2d 1375, 1378 (D.C. Cir. 1984).

In *United Presbyterian*, the plaintiffs were political and religious organizations and private individuals who were active in political, religious, academic, or journalistic affairs. *Id.* at 1377. They sought to challenge the legality of President Reagan's Executive Order No. 12333, which established procedures for intelligence surveillance and collection. *Id.* Plaintiffs characterized their injury as the "'chilling' of constitutionally protected activities which they may refrain from pursuing out of fear that such activities would cause them to be targeted for surveillance under the order" in violation of the First Amendment. *Id.* The Court ruled that "[t]he harm of 'chilling effect' is to be distinguished from the immediate threat of concrete, harmful action[,]" *id.* at 1380, and it distinguished the alleged "present deterrence from First Amendment conduct" from "imminence of concrete, harmful action such as threatened arrest for specifically contemplated First Amendment activity," which would support standing. *Id.* Here, plaintiff suffers only from "present deterrence from First Amendment conduct" and the Court is bound by Supreme Court and Circuit precedent to conclude that the complaint does not allege an actual, concrete injury.

In reaching its decision in *United Presbyterian*, the Court of Appeals reviewed the cases in which the Supreme Court had found an alleged "chilling effect" to be sufficient, and it observed that in all of the cases, the plaintiff had "unquestionably suffered some concrete harm (past or

immediately threatened) apart from the 'chill' itself." *Id.* at 1378–79.  For example, a plaintiff was found to have alleged a concrete injury where he had been "denied admission to the bar," "discharged from state employment," "denied the delivery of mail," or "required to take an oath on pain of dismissal from state employment." *Id.*, citing *Baird v. State Bar of Arizona*, 401 U.S. 1 (1971); *Keyishian v. Board of Regents*, 385 U.S. 589 (1967); *Lamont v. Postmaster General*, 381 U.S. 301 (1965); *Baggett v. Bullitt*, 377 U.S. 360 (1964).

The Supreme Court explained in *Laird v. Tatum*:

> [I]n each of these cases, the challenged exercise of governmental power was regulatory, proscriptive, or compulsory in nature, and the complainant was either presently or prospectively subject to the regulations, proscriptions, or compulsions that he was challenging.

408 U.S. at 11.  And as the D.C. Circuit observed, the "[c]hilling effect is cited as the *reason* why the governmental imposition is invalid rather than as the *harm* which entitles the plaintiff to challenge it." *United Presbyterian*, 738 F. 2d at 1378–79. (emphasis in original).

This is the critical problem with plaintiff's case.  The "no-deny" provision does not apply to Cato, it does not govern Cato's conduct, and a breach of the contractual provision would not result in any consequences to it.  Rather, the "no-deny" provision applies to third parties not before the Court, and it provides that if *they* were to engage in certain activities, the SEC might seek to

reopen their consent judgments.[4]  Plaintiff – despite the conclusory allegation that it is "unable" to do so – has not alleged that there is any actual impediment to its exercise of its contractual rights to publish the book, to its sponsorship of a panel discussion, or to its promotional activities.  And, more important, as in *United Presbyterian*, plaintiff fails to allege that "any specific action is threatened or even contemplated against [it]."  738 F.2d at 1380.

The most plaintiff alleges is that some individuals feel constrained not to come forward because of the risk of SEC action,[5] but "the plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth*,

---

[4]     Defendants argue that the alleged harm is too hypothetical and speculative to support Article III standing.  They point out that in the event an individual party to a consent judgment with a no-deny provision breaches the provision, several events must occur.  First, the SEC must decide to pursue reopening the case – it is not compelled to do so by statute or regulation.  Defs.' Mot. at 16.  Then, the SEC must move to vacate the consent judgment in the court in which the judgment was entered.  *Id.*  The court then must grant the SEC's motion – which the court can of course refuse to do.  *Id.*  For these reasons, defendants argue, any injury would be contingent on future events and the actions of numerous third parties, and so it is too speculative to support standing.  *Id.*; *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990) (a "possible future injury" cannot satisfy the requirements of Article III; an injury must be "certainly impending" to constitute injury-in-fact); *Pub. Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*, 489 F.3d 1279, 1293 (D.C. Cir. 2007) ("[T]he asserted injury must be . . . certainly impending and immediate—not remote, speculative, conjectural, or hypothetical.").

But these considerations would affect an action brought by the author or the other individuals described in their complaint, and the Court need not address whether they could allege an injury that is sufficiently imminent.  Plaintiff is not alleging that it would be harmed in the future; it is alleging it cannot speak freely now. Pl.'s Opp. at 3–4. So the problem with the complaint is the first prong of the injury-in-fact test – the lack of a concrete and particularized harm – and not whether that alleged injury is actual and imminent, as opposed to merely hypothetical or conjectural, under the second prong.

[5]     With respect to the other individuals who came forward after the complaint was filed, plaintiff alleges that they are unwilling to make public statements or to allow them to be made because of the orders that bind them.  Am. Compl. ¶ 43; *see also id.* ¶ 46.  But plaintiff does not even allege that the author, whose manuscript prompted this lawsuit, has withheld his permission or impeded publication in any way.  It says only that the author is barred from public comment, *id.* ¶ 38, and then simply asserts that "as a direct result of this gag order," plaintiff cannot publish. *Id.* ¶¶ 39–40.

422 U.S. at 499 (plaintiffs lacked standing to allege that a town's zoning ordinance unlawfully excluded people of low income and of certain ethnic backgrounds because they did not allege that they had been personally injured by the ordinance, but only that they shared attributes common to persons that may have been excluded from the town); *see also Vietnam Veterans of Am. v. Shinseki*, 599 F.3d 654, 662 (D.C. Cir. 2010) (finding that two veterans' advocacy groups lacked standing to bring an action against the Secretary of the Department of Veterans Affairs alleging that the average time it took the agency to process veterans' claims for service-related disability benefits violated the Administrative Procedure Act and the Due Process Clause of the Constitution, because it was "apparent that they were presenting a claim not for themselves but for others" and "one can not have standing in federal court by asserting an injury to someone else").

Plaintiff suggests that these principles do not apply to a would-be publisher. It submits that "it is far from unusual in the First Amendment context for a publisher to bring a claim that hinges on the free-speech rights of others whose speech it wants to publish." *See* Pl.'s Opp. at 7–8. But these cases are distinguishable from the instant situation: each involved laws that directly regulated publishers. *See, e.g.*, *Simon & Schuster, Inc. v. Member of the N.Y. State Crime Victims Bd.*, 502 U.S. 105, 109 (1991) ("Son of Sam" law required publishers contracting with convicted persons to turn over income under the contract to the New York State Crime Victims Board); *Retail Dig. Network, LLC v. Appelsmith*, 810 F.3d 638, 647 (9th Cir. 2016), *on reh'g en banc sub nom. Retail Digital Network, LLC v. Prieto*, 861 F.3d 839 (9th Cir. 2017) (because plaintiff could face criminal penalties for placing certain advertisements on its retail displays, it could bring a First Amendment challenge to the law proscribing its conduct).

Plaintiff also relies heavily on *Pitt News v. Pappert*, 379 F.3d 96 (3d Cir. 2004), suggesting it "presents almost precisely the same scenario as this case." Pl.'s Opp. at 7–8. In that case, a

university newspaper challenged a law prohibiting alcoholic beverage advertisements in any publication associated with an educational institution. *Pitt News*, 379 F.3d at 102–03. After a local restaurant was threatened with sanctions and cancelled its advertising contract with the Pitt News, "the paper, in order to protect advertisers, felt compelled to stop accepting alcoholic beverage advertisements." *Id.* at 103. As a result, the newspaper "lost approximately $17,000 in revenue, and this loss affected the length of the newspaper [and] its ability to make capital expenditures." *See id.*

In the opinion cited by the plaintiff, the court ruled on the merits that "[i]mposing a financial burden on a speaker based on the content of the speaker's expression is a content-based restriction." *Id.* at 106. But the decision did not address the standing issue. It recites the prior procedural history of the case, though, and it points out that a previous panel of the court decided "that *The Pitt News* did not have standing to assert the third-party claims of its advertisers and readers," but that it "did have standing to raise its own First Amendment claims. Noting the paper's loss of advertising revenue, the panel held that the paper had 'demonstrated a personal stake in the outcome of this litigation.'" *Id.* at 103–04. In the absence of similar factual allegations here, the *Pitt News* case, which would not be binding in any event, is not analogous.

Finally, plaintiff attempts to ground its standing in its rights as a receiver of information. In the First Amendment context, the Supreme Court has recognized that "where a speaker exists . . . the protection afforded [by the First Amendment] is to the communication, to its source and to its recipients both." *See Va. State Bd. of Pharmacy v. VA Citizens Consumer Council, Inc.*, 425 U.S. 748, 756–57 (1976) (holding that consumers have standing to assert the First Amendment protection enjoyed by advertisers because "[i]f there is a right to advertise, there is a reciprocal right to receive the advertising"). Thus, the D.C. Circuit has recognized that "listeners . . . can

suffer injury from government regulations that prevent speakers from saying what the listeners wish to hear." *Competitive Enter. Inst. v. U.S. Dep't of Transp.*, 856 F.2d 1563, 1566 (D.C. Cir. 1988).  This has been framed as the "right to receive information." *Gregg v. Barrett*, 771 F.2d 539, 547 (D.C. Cir. 1985).  And plaintiff points out that courts "have routinely found . . . that third parties have standing to challenge protective orders and confidentiality orders in an effort to obtain access to information or judicial proceedings."  Pl.'s Opp. at 6, citing *Pansy v. Borough of Stroudsburg*, 23 F.3d 772, 777 (3d Cir. 1994) (footnote omitted); *Ford v. City of Huntsville*, 242 F.3d 235, 241 (5th Cir. 2001); *Appl. of Dow Jones & Co.*, 842 F.2d 603, 607 (2d Cir. 1988).

In these cases, however, the parties seeking information identified their lack of access to information as the actionable injury.  Here, plaintiff does not assert that it has been denied access to any information; it alleges that it received and is fully aware of the contents of the author's manuscript, and it grounds this lawsuit on a claimed inability to disseminate it further. [6]  Therefore,

---

[6]     For the same reason, the case can be distinguished from *Overbey v. Mayor of Baltimore*, 930 F.3d 215 (4th Cir. 2019).  *See generally* Pl.'s Notice.  In that case, the Fourth Circuit found that the Baltimore Brew's "interest in newsgathering" was impeded because parties who settled police brutality suits – subject to non-disparagement clauses – refused to discuss their suits with the Brew.  *Overbey*, 930 F.3d at 221.  The Court found that "the Brew [had] sufficiently alleged that the City's pervasive use [of] non-disparagement clauses in settlement agreements with police brutality claimants [had] interfered with its right to *receive* newsworthy information from willing speakers."  *Id.* at 228 (emphasis added).  Unlike the newspaper in Baltimore, plaintiff Cato has received information from willing speakers, and the comparison fails.

plaintiff has not alleged any injury it suffered as a listener that could be the basis for Article III standing.[7]

## CONCLUSION

Because the Court finds that plaintiff lacks standing to challenge the constitutionality of the SEC's "no-deny" provision, the Court will grant defendants' motion to dismiss under Federal Rule of Civil Procedure 12(b)(1), and it need not address the sufficiency of the claims under Rule 12(b)(6).

A separate order will issue.

AMY BERMAN JACKSON
United States District Judge

DATE:  February 10, 2020

---

[7]     Plaintiff argues that the "unconstitutional conditions" doctrine – that the government may not condition a benefit on the waiver of a constitutionally protected right – invalidates the contractual provisions at issue.  Pl.'s Opp. at 13–17.  The complaint does not allege that the settling individuals' waivers of their right to speak publicly were made in exchange for a governmental benefit, but more important, Cato is not bound by the provisions, and it has no standing to challenge their validity, or whether any waivers were knowing and voluntary.